IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TASTE OF NATURE, Inc., a California Corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 22-CV-03261 |
| v. | ) ) ) | Hon. John J. Tharp, Jr. |
| MRS. FIELDS FAMOUS BRANDS, LLC, now known as FAMOUS BRANDS, LLC, a Delaware limited company, | ) ) ) ) | |
| Defendant. | ) ) | |

**DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF FACTS**

Defendant Mrs. Fields Famous Brands, LLC, now known as Famous Brands, LLC ("Mrs. Fields") respectfully submits this submits the following statement of facts in support of its motion for summary judgment pursuant to Federal Rules of Civil Procedure 56 and Local Rule 56.1.

**The Parties and the Commercial License Agreement**

1. In August 2017, plaintiff Taste of Nature, Inc. ("TON") and Mrs. Fields executed a License Agreement ("Agreement"). A true and correct copy of the Agreement is attached as Exhibit A to the First Amended Complaint in this case. First Amended Complaint ("FAC"), ¶4, & Ex. A thereto, Dkt. 38. A true and correct copy of the two amendments to the Agreement are attached as Exhibit B to the FAC. FAC, ¶5 & FAC, Ex. B thereto, Dkt. 38.

2. In the Agreement, Mrs. Fields gave TON the exclusive right to manufacture and market Mrs. Fields-branded products to certain retailers. FAC, ¶33; FAC, Ex. A, §§1(h), (j), 2.

3. TON is a candy and snack food manufacturing company that makes and sells food products to be distributed and sold through retailers nationwide. FAC, ¶2.

4. Mrs. Fields is the licensor or owner of "Mrs. Fields" trademarks and logos, which it uses in the restaurant and food service industry and in association with food products such as cookies, confectioneries, ice cream, and other baked goods. FAC, ¶¶3, 25. "Mrs. Fields" branded entities operate multiple lines of business, including: (1) franchising stores that serve fresh-baked cookies; (2) licensing the "Mrs. Fields" trademark and recipes to make and sell shelf-stable cookies for sale in retail stores such as grocery, drug, and convenience stores; (3) making online and catalogue-based gift sales directly to consumers; and (4) producing confections and other food products. FAC, ¶25.

5. Among other things, the Agreement granted TON the exclusive right over a ten- year term to manufacture and market Mrs. Fields-branded, prepackaged cookies through Designated Distribution Channels, defined as "Designated Retailers and distributors to Designated Retailers." FAC, Ex. A, §§1(g), 2.

6. Designated Retailers in turn was defined as "all businesses that sell products to consumers for their own use and consumption (and not intended for resale by such consumers)," including a list of 15 types of such businesses. FAC, Ex. A, §1(h). One such listed type of business was

> (x) value/deep discount/dollar stores (e.g., Dollar General and Dollar Tree); provided, however, that sales in this channel may not, *at any time*, exceed 20% of Licensee's total Net Sales from all Royalty Bearing Products . . .

*Id.*, §1(h)(x) (emphasis added); Tejada Dep., 17:3-18:12 (Ex. F). The purpose of this provision (the "20% Sales Limitation") is to protect the brand because directing product to this channel could devalue the brand and Mrs. Fields products sold by Mrs. Fields at full price. Tejada Dep., 18:13-19:5, 188:17-189:12 (Ex. F).

7. TON was required to report all sales of Mrs. Fields products to Mrs. Fields within 30 days after the end of each quarter, any authorized deductions such as discounts or rebates, and to calculate and pay the royalties owed by TON to Mrs. Fields for those sales. FAC, Ex. A, §§ 6, 7.1,

1(c), (d), (m).

8. Section 1(h) provided that Mrs. Fields "shall have the right in its sole discretion to determine whether a specific store or distributor qualifies as a Designated Retailer." *Id.,* §1(h).

9. Section 7.2 of the Agreement gave Mrs. Fields the right to conduct an audit:

> Throughout the Term and for at least thirty-six (36) months thereafter, Licensee shall maintain complete and accurate books of account and related documents such as vouchers and invoices relating to the financial obligations of Licensee to Licensor under this Agreement. Licensor and its agents and representatives shall have the right, at any time during normal business hours and with reasonable prior notice to Licensee, to enter any business locations of the Licensee at which any of such books of account and related documents are maintained and to inspect, review, copy and audit the relevant books and records and other documents and materials in the possession or control of the Licensee relating to this Agreement, including, without limitation, such books, records, documents and materials as may be requested by Licensor in order to confirm that Licensee is in compliance with this Agreement and any other requirements relating to quality, safety and food standards. Licensee shall reasonably cooperate with Licensor in facilitating any such audit.

10. Mrs. Fields had the right to terminate the Agreement immediately on written notice under certain enumerated circumstances, one of which was "if Licensee fails to perform any other term or condition of this Agreement and such default continues unremedied for thirty days after Licensor's written notice of default." *Id.,* §15.2(e). Mrs. Fields also had the right to terminate the Agreement immediately "if Licensee fails to comply with any term or condition of this Agreement for which Licensor has sent notice of breach on more than three (3) occasions during any 12-month period regardless of whether such failure was cured by Licensee. . . ." *Id.,* §15.2(f).

11. Nelson Tejada was Mrs. Fields' CEO from September 2020 to May 2024. Tejada Dep., 6:1-9 (Ex. F) Tejada was responsible for overseeing Mrs. Fields' license agreements. Tejada Dep., 6:13-22, 195:6-11 (Ex. F). Tejada has nearly 40 years of experience in the retail industry and is familiar with value, deep discount and dollar store retail channels. Tejada Dep., 32:13-21 (Ex. F). Tejada also has information about value, deep discount and dollar store retail channels based on the

3

publicly available information, branding and marketing by such channels. Tejada Dep., 32:22-33:23 (Ex. F).

### The Audit Request and TON's Breach and Failure to Cure

12. On February 28, 2022, Mrs. Fields informed TON that it elected to conduct an audit pursuant to Section 7.2 of the Agreement in a written request sent by Tejada to TON's CEO, Scott Samet. FAC, ¶54, Ex. J; Ex. 29; Tejada Dep., 137:8-23 (Ex. F). Mrs. Fields sent a list of documents requested to conduct its audit, stating it "would like to schedule a mutually agreeable time to inspect TON's books and records relating to the Agreement," and asking TON to let Mrs. Fields know what days in the next two weeks would be convenient for TON. FAC, Ex. J, PageID#308; Ex. 29. Mrs. Fields never received any response from TON to Mrs. Fields' February 28, 2022 request for a convenient date to inspect and copy the books and records. Tejada Dep., 191:15-192:16 (Ex. F).

13. Mrs. Fields also invited TON to consider if the audit could be conducted remotely. FAC, Ex. J, PageID#309; Ex. 29; Tejada Dep., 139:20-140:9. After follow-up calls with TON, TON told Mrs. Fields that TON would provide the requested documents remotely. Tejada Dep., 141:7-142:22 (Ex. F).

14. TON requested that Mrs. Fields execute a nondisclosure agreement or NDA, and Mrs. Fields complied with that request and signed it on March 11, 2022. FAC, ¶55 and Ex. K; Tejada Dep., 214:17-215:4, 216:8-17 (Ex. F).

15. Julie Girardot, Mrs. Fields' Vice President of Finance, and a CPA, has familiarity with audits and reported to Tejada. Girardot Dep., 5:17-23, 14:18-15:17, 22:8-11, 30:1-33:24 (Ex. D). Girardot was appointed the lead contact with TON for the audit, assisted by consultants Geoff Griffen and Ryan Paskin, CPA, at Famous Brands' private equity sponsor, Z Capital Group. Girardot Dep., 35:6-37:24 (Ex. D); Ex. 23 (TON Deposition Exhibit No. 3).

16. On March 15, 2022, Mrs. Fields emailed TON a list of requested documents for the

audit, stating, "Please upload the data to drop box… by March 31, 2022." Ex. 12 (TON Deposition Exhibit 36); Tejada Dep., 196:5-198:16 (Ex. F); Girardot Dep., 38:19-40:11 (Ex. E); Ex. 37 (TON Deposition Exhibit 4). TON never objected to the March 31, 2022 deadline. Girardot Dep., 133 :19-134 :8 (Ex. D). Before TON's outside counsel sent a letter dated April 8, 2022, TON never expressed any confusion or objected to any of the requests for documents for the audit set forth in the February 28, 2022 audit request and the follow-up March 15, 2022 request. Girardot Dep., 134:9-135:7 (Ex. D)

17. On March 29, 2022, Mrs. Fields communicated internally about not receiving any documents from TON yet: Mrs. Fields' Vice President of Finance stated, "I did meet with them so they know what they need to pull." Ex. 13 (TON Deposition Exhibit 35); Tejada Dep., 192:18-196:3 (Ex. F).

18. In the evening on March 31, 2022, Girardot emailed Scott Samet at TON reminding him that the deadline was March 31, 2022, and asking if he would be providing documents because nothing had been provided yet. Ex. 12 (TON Deposition Exhibit 36); Tejada Dep. 196:5-199:4 (Ex. F). In response later that evening on March 31, 2022, Doug Chu of TON emailed Girardot asking, "May I start sending you some of the requested info tomorrow?", to which Girardot replied, "Please send the data as soon as possible." Ex. 14 (TON Deposition Exhibit 5); Girardot Dep. 57:5-58:11, 59:17-60:22 (Ex. D). Girardot reiterated that the deadline for the documents was March 31, 2022. Ex. 12 (TON Deposition Exhibit 36).

19. TON first began uploading some documents to the dropbox folder provided by Mrs. Fields at or near 1:18 ET on April 2, 2022. Ex. 24 (TON Deposition Exhibit 7); Girardot Dep. 72:8-73:13. By April 1, 2022, TON had not provided the documents and information requested by Mrs. Fields to conduct the audit. *See* Ex. 16 (TON Deposition Exhibits 9, 10, 11); Girardot Dep., 79:18-81:1, 82:9-85:4 (Ex. D); Tejada Dep., 152:7-153:1, 172:22-173:16, 174:7-13 (Ex. F); Ex. 31. The

5

documents initially uploaded by TON on April 2, 2022 were incomplete and were not all of the documents requested. Tejada Dep., 152:7-153:1 (Ex. F); *see* Ex. 16 (TON Deposition Exhibits 9, 10, 11); Girardot Dep., 79:18-81:1, 82:9-85:4 (Ex. D).

20. At or near 10:17 pm ET on April 1, 2022, Mrs. Fields' outside law firm, Amini, LLC, emailed to Mrs. Fields, the April 1, 2022 letter which attorney Avery Samet of Amini, LLC had been authorized by Mrs. Fields to send to TON. Ex. 31 (TON Deposition Exhibit 38); Tejada Dep., 79:22-81:8, 201:23-202:20 (Ex. F); *see also* FAC, ¶56 & Ex. L thereto. The April 1, 2022 letter stated it was putting TON on notice of three separate breaches of the Agreement, and also gave TON the 30-day notice to remedy the breaches pursuant to the termination-for-cause provision of the Agreement in Section 15.2. FAC, Ex. L; Ex. 31. The letter stated that TON had breached the Agreement by (1) breaching Section 7.2 by failing to provide the documentation requested by Mrs. Fields to conduct the audit, (2) selling more than 20 percent of Net Sales into the "value/ deep discount/ dollar channel," and (3) selling Royalty Bearing Products over the internet in violation of Sections 1(h), (j), and 2 of the Agreement. FAC, Ex. L; Ex. 31.

21. On April 2, 2022, Mrs. Fields received some documents from TON in the Drop Box folder. Ex. 15 (TON Deposition Exhibit 8); Girardot Dep. 75:4-79:10. However, TON did not provide all of the requested documents. *See* Ex. 16 (TON Deposition Exhibits 9, 10, 11); Girardot Dep., 79:18-81:1, 82:9-85:4 (Ex. D). TON had not provided: (1) complete sales journals for all products for 2018 and 2019, (2) 2018 and 2019 general ledges trial balances and reconciliations from the 2018 to 2021 general ledger trial balances to the sales journals to validate the completeness of the information, (3) 2018 and 2021 financial statements and reconciliations for 2018 to 2021 financial statements to the annual general ledger trial balances, (4) no underlying financial detail on the reported deductions from sales of Mrs. Fields productions, and (5) no summary of all consumer complaints received and responses and resolutions. Ex. 16 (Deposition Exhibits 10, 11).

22. Complete sales documents and financial statements were necessary to audit whether TON had reported all sales of Mrs. Fields products to Mrs. Fields. Girardot Dep., 34:9-21, 54:6-55:23.

23. On April 8, 2022, Mrs. Fields emailed TON that Mrs. Fields had reviewed the files received on April 2 but certain requested documents were missing. Ex. 17 (TON Deposition Exhibit 15); Girardot Dep., 101:19-103:2 (Ex. D). Mrs. Fields reminded TON that the deadline had been March 31. Ex. 17 (TON Deposition Exhibit 15). Mrs. Fields provided a list of outstanding requests and asked TON to provide a delivery date for the remaining requests. Ex. 17 (TON Deposition Exhibit 15).

24. In an April 8, 2022 letter, TON's outside counsel responded. The April 8, 2022 letter on behalf of TON did not provide the missing audit documentation and took the position, for the first time, that TON was demanding that any documents must be inspected on TON's premises for an on-site audit. FAC, ¶58, Ex. M; Ex. 25 (TON Deposition Exhibit 22); Tejada Dep., 94:7-95:2 (Ex. F).

25. On April 26, 2022, Mrs. Fields' counsel sent another letter to TON and its counsel. Ex. 26 (TON Deposition Exhibit 23); Tejada Dep., 170:11-171:24 (Ex. F). The April 26, 2022 letter stated that TON had not made any demonstration to date of any cure to the defaults identified in the April 1 letter. Ex. 26. The April 26, 2022 letter further stated that Mrs. Fields would send a representative to conduct the audit on TON's premises. Ex. 26. Mrs. Fields never restricted or prohibited TON from providing the audit documents first requested on February 28, 2022, and TON never provided the missing documents. Tejada Dep., 172:2-174:13 (Ex. F).

26. As part of Mrs. Fields' continuing efforts to obtain the audit documents requested February 28, 2022, Mrs. Fields retained audit firm Gingold & Company to go to TON's office to audit compliance with the royalty requirements of the Agreement. Tejada Dep., 174:15-175:21 (Ex. F); Gilroy Decl., ¶9 (Ex. A); Ex. 18 (TON Deposition Exhibit 12); Gilroy Dep., 15:10-23, 30:20-

7

32:7 (Ex. E). The purpose of the engagement was to audit compliance by Taste of Nature with the Agreement, including ensuring completeness of the licensed sales data through an analysis of a sale summary for all sales (licensed and non-licensed sales) and reconciling these sales to the total sales reported in the licensee's financial statements. Gilroy Decl., ¶12 (Ex. A); Gilroy Dep., 24:15-19 (Ex. E).

27. Steven Gilroy of Gingold & Company was assigned to be the Audit Supervisor for the TON royalty compliance engagement. Gilroy Decl., ¶9 (Ex. A); Gilroy Dep., 7:11-8:11 (Ex. E). Gilroy has been a Certified Public Accountant in the State of California for the past five years and is an experienced CPA specializing in royalty and residuals compliance engagements. Gilroy Decl, ¶2 (Ex. A); Gilroy Dep., 8:7-9:6 (Ex. E). Gilroy graduated from Pitzer College, Claremont, California, with a degree in economics in 2006. Gilroy graduated from the University of California, Los Angles (UCLA) in 2014 with a certificate in accounting. Gilroy Decl., ¶3 (Ex. A).

28. Since 2016, Gilroy has conducted royalty and residual engagements as a CPA for the purpose of rendering opinions as to whether entities have reported royalties or residual payments owed to other entities free of material misstatement and in accordance with contractual obligations. Gilroy Decl., ¶4 (Ex. A). From 2015 to 2016 Gilroy worked as a Senior Royalty Accountant, leading a team of accountants in processing royalty transactions for 20th Century Fox's Digital Home Entertainment division. *Id.,* ¶5. Since 2016, Gilroy has worked at Gingold & Company, an accounting firm that specializes in conducting compliance engagements in the fields of licensed merchandise, motion picture, television, intellectual property and the music recording industries. Gilroy Decl., ¶6 (Ex. A).

29. Gilroy is an Audit Supervisor at Gingold & Company. As Audit Supervisor, Gilroy oversees and coordinates royalty and residuals compliance engagements. That review includes review of contracts, financial statements, sales, payments, inventory, production, advertising and

promotional expenses, distribution agreements and distribution statements. After Gilroy's review and analysis, he drafts reports, discusses findings and resolves engagements with the contracting parties. Gilroy Decl., ¶7 (Ex. A).

30. Auditors are required to maintain the confidentiality of confidential information obtained in the course of their work. Gingold & Company and Gilroy have regular procedures to ensure that they protect confidential information. One such procedure is to enter into a Nondisclosure Agreement, commonly referred to as an NDA, which Gingold & Company often executes when it is retained to conduct a royalty/residual compliance engagement. Gilroy Decl., ¶8 (Ex. A). A royalty compliance audit is an audit that tests that correct royalties were reported and paid to a licensor as required by the contract between licensor and licensee. Gilroy Dep., 47:17-21 (Ex. E).

31. On May 3, 2022, Mrs. Fields provided TON a copy of Gingold & Company's questionnaire and document request list to help expedite the audit process. Ex. 19 (TON Deposition Exhibit 72) Gilroy Dep., 194:16-198:12 (Ex. E). There are often records besides those specifically relating to the licensed products that are required to verify compliance with the contract agreement. Gilroy Dep., 35:3-13 (Ex. E). The documents listed in Gingold's document request list in Exhibit 19 (TON Deposition Exhibit 72) were required to confirm that TON was in compliance with the Agreement. Gilroy Dep., 80:4-22, 82:20-81:5 (Ex. E). Company-wide financial documents are within relevant books and records that relate to the license agreement because company-wide sales documents and financial statements are necessary for auditors to verify the completeness of the licensed product data provided by the licensee. Gilroy Dep., 83:7-20 (Ex. E).

32. On May 9, 2022, Gilroy visited TON's office in Santa Monica, California, to conduct fieldwork for the engagement, Gilroy Decl., ¶10 (Ex. A); Gilroy Dep., 111:23-112:10 (Ex. E), and to conclude the audit process commenced in February 2022. Tejada Dep., 162:17-21, 172:22-173:16 (Ex. F). Before going to TON's office, Gilroy had received documents from Mrs. Fields that

appeared to have come from TON. Gilroy Dep., 87:8-88:19 (Ex. E). Gilroy testified that he reviewed the documents that Mrs. Fields provided to Gingold prior to the fieldwork on May 9, and that those documents are listed on TON Deposition Exhibit 8 (Ex. 15 hereto). Gilroy Dep., 89:12-90:17 (Ex. E). Part of Gingold's audit process is to request all related documents from both parties. Gilroy Dep., 91:1-14 (Ex. E). Prior to the fieldwork, Mrs. Fields provided Gingold with copies of the 2018 to 2021 royalty reports and the other documents referenced on TON Deposition Exhibit 8 (Exhibit 15 hereto). Gilroy Dep., 93:4-24, 95:18-98:20, 105:20-106:8 (Ex. E). The documents Gingold received from Mrs. Fields prior to the May 9 fieldwork visit were incomplete for the period that was under audit. Gilroy Dep., 108:1-11 (Ex. E).

33. On May 9, 2022, Gilroy was escorted to a conference room at TON's offices. Gilroy Dep., 117:5-13, 190:22-191:20 (Ex. E). TON refused to give Gilroy a tour of the facility when Gilroy requested a tour as part of his audit procedures. Gilroy Dep., 191:2-20 (Ex. E). On May 9, 2022, TON did not provide any documents in physical form to Gilroy for him to inspect or make copies of, and provided only invoice level sales detail in electronic form that day. Gilroy Dep., 117:8-120:18, 139:15-140:, 193:9-23 (Ex. E). Gilroy interviewed Scott Samet, president of TON, as required by the auditor's fieldwork procedures. Gilroy Decl., ¶11 (Ex. A); Gilroy Dep. 112:13-113:4 (Ex. E). Samet did not answer all of Gilroy's questions. Gilroy Decl., ¶11 (Ex. A). Samet did not provide documents and other information requested that was necessary for Gilroy to conduct the royalty compliance engagement. *Id.*; Gilroy Dep., 47:7-10, 126:2-127:17, 140:7-21 (Ex. E).

34. On May 9, 2022, Gilroy requested that TON provide the following information for his compliance work: (a) financial statements, including audited financial statements and internal profit and loss statements; (b) company-wide sales information of Taste of Nature; and (c) a complete listing of licensed products reflecting all licensed and non-licensed products and all sales catalogs and price lists prepared for licensed articles. *Id.* ¶12; Ex. 35 (TON Deposition Exhibit 68);

10

Gilroy Dep., 141:15-144:18 (Ex. E). TON refused to provide this information. Gilroy Decl., ¶12 (Ex. A).

35. The information requested in paragraph 34 above is routinely requested in royalty compliance engagements and necessary to test to ensure completeness of the licensed sales provided by the licensee by analyzing a sales summary by item number for all sales (licensed and non-licensed sales) and reconciling these sales to the total sales reported in the licensee's financial statements. Gilroy Decl., ¶12 (Ex. A).

36. TON's refusal to provide the information in paragraph 35 above was a scope limitation on the compliance engagement. The engagement could not be completed without the information in paragraph 24 above. This scope limitation is also commonly referred to as a "red flag" to auditors. Gilroy Decl., ¶12 (Ex. A); Gilroy Dep., 134:14-135:11, 191:21-193:7 (Ex. E); Ex. 34 (TON Deposition Exhibit 66).

37. Gilroy also asked TON on May 9, 2022 to provide the following additional information for the audit: (a) an invoice level sales report for all Mrs. Fields licensed articles for the engagement period; (b) a record of all payments made to Mrs. Fields during or covering activity from the engagement period; (c) a report of activity by vendor for all Mrs. Fields licensed articles purchased during the engagement period; (d) inventory records for each Mrs. Fields licensed product as of the start date and end date of the engagement period; and (e) all approved Marketing Plans for the engagement period as well as the related advertising and promotion materials. On May 9, TON stated it would provide the information requested but TON did not do so on May 9 or after Gilroy followed up on May 17, 2022. Gilroy Decl., ¶13 (Ex. A); Gilroy Dep., 158:24-160:21 (Ex. E).

38. Gilroy completed his questionnaire based on his visit at TON's facilities. Steven Gilroy Decl., ¶16; *see also* Ex. 34 (TON Deposition Exhibit 66); Gilroy Dep., 133:16-134:21 (Ex.

11

E). On the questionnaire, Gilroy noted that TON's overall tone was "questionable", his overall experience with TON' available data was "withholding", and that his overall impression was that TON was not an honest company. Ex. 34 (TON Deposition Exhibit 66); Gilroy Dep., 135:12-136:23 (Ex. E).

39. Gilroy was unable to conduct the audit because of TON's refusal and failure to provide the request information for the audit. Gilroy Decl., ¶15 (Ex. A). When Gilroy described the requested information in paragraph 35 on May 9, 2022, Samet did not state that he did not understand any of the requests. *Id*.

40. Gilroy also asked Scott Samet at TON while on site on May 9 to do a "live run" of sales data selections, which is a standard audit procedure. Gilroy Dep., 116:11-14 (Ex. E). A live run consists of the auditor selecting sales totals for a varied selection of licensed product SKUs and for specific time periods like a single quarter and then have the licensee run that on their system live so that the auditor can compare that to the reports that were provided for the audit. Gilroy Dep., 116:15-20 (Ex. E). TON did not permit Gilroy to conduct the live run audit procedure on May 9 and requested that that procedure be conducted remotely the following day. Gilroy Dep., 116:21-117:2, 128:4-130:19 (Ex. E). During the live audit run, Gilroy encountered conflicts and was unable to reconcile certain totals. Gilroy Dep., 130:24-131:24 (Ex. E). When Gilroy identified the discrepancies in the TON reports provided, Gilroy asked that TON provide sales reports run with consistent parameters for the entire engagement period and TON denied that request, which prevented Gilroy from moving forward with the audit. Gilroy Dep., 132:1-14 (Ex. E). Gilroy testified that "Discrepancies between the numbers of the live run and the sales files that we had is a flag to us that there may have been potential reporting shortfalls, but at that point, we can't confirm that because we would need to do additional testing." Gilroy Dep., 132:15-133:4, 137:1-138:19 (Ex. E).

12

41. On May 17, 2022, Gilroy sent an email to Scott Samet of TON to follow up on the requested documents. Samet responded in an email on May 18, 2022. Gilroy Decl., ¶17 (Ex. A); Ex. 20 (TON Deposition Exhibit 18); Gilroy Dep., 145:1-146:17 (Ex. E). Samet responded in an email on May 18, 2022, but did not provide the requested information which was necessary to test TON's sales reports for completeness. Gilroy Decl., ¶17 & Ex. 1 thereto (Ex. A); Gilroy Dep., 146:18-151:5, 158:4-23, 163:15-164:4 (Ex. E); Ex. 20 (TON Deposition Exhibit 18).

42. On May 18, 2022, TON's responses also asked for templates for purchase order history and inventory reports. Ex. 20 (TON Deposition Exhibit 18); Gilroy Dep., 151:7-10 (Ex. E). Gilroy had already provided Samet with a template for the purchase order history and had discussed the inventory parameters and data needed and had shown sample documents to TON because there was no set inventory template. Gilroy Dep., 151:11-153:19, 164:7-14 (Ex. E).

43. TON has never provided the requested information that was outstanding as of May 17, 2022. FAC, ¶64; FAC, Ex. Q; Gilroy Decl., ¶17 (Ex. A); Ex. 36 (TON Deposition Exhibit 69); Gilroy Dep., 161:9-167:22 (Ex. E); Tejada Dep., 174:7-13, 174:22-175:7, 186:21-187:6 (Ex. F). Gilroy was unable to complete the audit and come to conclusions about TON's compliance with the Agreement due to the inability to conduct completeness audit tests and TON's failure to provide requested documents. Gilroy Dep., 169:1-172:1, 173:8-177:5, 185:2-186:10 (Ex. E).

**TON's Breach of the 20% Sales Limitation and Failure to Cure**

44. By March 29, 2022, Mrs. Fields had reviewed TON's 2021 quarterly royalty reports and determined that TON had sold over 20% of its total net sales to the value/deep discount/dollar store channel in quarters 2 (20.3%), 3 (36.2%), and 4 (22.7%), and for the entire year (24.7%). Ex. 7 at FB000497 (TON Deposition Exhibit 21); Ex. 6 (TON Deposition Exhibit 20) ; Tejada Dep., 22:2-25:2, 47:1-48:15, 61:13-63:17 (Ex. F).

45. Mrs. Fields included Ross Stores, Inc. in the value/deep discount/dollar store

channel, citing Ross Stores' "about us" page and that Google listed them as a "discount store company". Ex. 7 at FB000941. Value, deep discount and dollar stores are stores where products are sold at a discounted price point and advertised in that manner. Tejada Dep., 33:7-19, 34:2-5, 34:6-18 (Ex. F).

46. Ross Stores is a value and deep discount retailer based on its advertising discounts up to 60%, "Ross Dress for Less" advertising and discount marketing on its website and at its stores. Tejada Dep., 45:13-46:20 (Ex. F) Mrs. Fields reviewed websites and public information for Ross Stores and concluded by March 30 that Ross Stores was a "value/deep discount/dollar store". Ex. 7 at FB000941; Tejada Dep., 45:13-46:20 (Ex. F); Tejada Decl., ¶¶4, 6 (Ex. C); Exs. 8, 10. Tejada and other Mrs. Fields representatives discussed the information regarding Ross Stores and concurred by March 30, 2022 that Ross Stores was a value or deep discount store and that TON was in breach of the 20% Sales Limitation. Tejada Dep., 48:13-15, 49:16-19, 55:8-17, 61:11-67:2, 68:9-14, 70:19-72:5, 75:1-10 (Ex. F).

47. The April 1, 2022, letter from Mrs. Fields' outside law firm, Amini, LLC, to TON provided notice of TON's breach of the 20% Sales Limitation. Tejada Dep., 79:22-81:8; Ex. L to FAC; Ex. 31.

48. The April 8, 2022 letter on behalf of TON took the position that the 20 percent limitation on sales to discount stores was not based on a calendar year period and should be cumulative. FAC, Ex. M. As Tejada explained, that position is unsupported because the Agreement states that the 20% Sales Limitation cannot be exceeded "at any time," and a cumulative sales analysis would undermine the brand, which is the very purpose of the Limitation. Tejada Dep., 22:2-25:2, 189:13-190:3 (Ex. F).

49. The April 8, 2022 letter on behalf of TON also took the position that the sales to deep discount stores during 2021 were less than 20 percent but did not provide any other information

regarding that position. FAC, ¶58, Ex. M; Ex. 25 (TON Deposition Exhibit 22); Tejada Dep., 95:3-8 (Ex. F).

50. On April 26, 2022, Mrs. Fields' counsel sent another letter to TON and its counsel. Ex. 26 (TON Deposition Exhibit 23); Tejada Dep., 98:3-6. The April 26, 2022 letter stated that TON had not made any demonstration to date of any cure to the defaults identified in the April 1 letter. The April 26, 2022 letter requested that TON provide proof that TON had cured the breach of the discount sales provision. Ex. 26; FAC, ¶59, Ex. N; Tejada Dep, 98:3-6 (Ex. F).

51. TON knew the channels it was selling to and had relationships with those retailers and had its own sales data. Tejada Dep., 104:16-24, 105:9-16, 106:1-7, 14-18, 128:1-14 (Ex. F). Mrs. Fields expected TON to cure the 20% Sales Limitation default by responding with an action plan to comply. Tejada Dep., 120:7-24, 126:5-23 (Ex. F).

52. By May 4, 2022, Mrs. Fields had reviewed TON's first quarter 2022 royalty report and determined TON had more than 20% of net sales in the value/deep discount/dollar store channel, violating §1(h)(x) of the Agreement. Ex. 9 (TON Deposition Exhibit 26); *see also* Ex. 6 (TON Deposition Exhibit 20).

53. TON delivered quarterly royalty or sales reports to Mrs. Fields for each quarter in 2021 and 2022. Exhibits 1, 2, 3, 4, and 5 (TON Deposition Exhibits 39 to 43) are copies of TON's quarterly royalty reports received by Mrs. Fields for the first, second, third and fourth quarters of 2021 and the first quarter of 2022, respectively. Tejada Dep., 203:3-11, 203:20-205:15, 206:11-207:19 (Ex. F).

54. TON's quarterly royalty reports for 2021 and for the first quarter of 2022 reflect sales to the following value/deep discount/dollar stores: Dollar Tree Store, Inc., Ross Stores, Inc., Ollies, Five Below, Wright's Dollar Plus, Dollar Discount – TX, June Dollar Store Plus (store#2), Dollar D3pot, Dollar Fair – NY, Do Dollar Plus, Dollar World – KY, Dollar & More - IL, City Line

15

Dollar, Dollar Mart – IL, Savvy Dollar, and Little River Dollar Store. Exhibits 1, 2, 3, 4, 5 and 6.

55. TON's royalty reports show that sales to deep discount stores exceeded 20% of TON's total Net Sales from all of the Mrs. Fields-branded products for each quarter since the second quarter of 2021. Ex. 6 (TON Deposition Exhibit 20). Section 1(m) of the Agreement provides that "'Net Sales' means the sum of the actual Billing Price of all sales of Royalty Bearing Products by Licensees or any of its authorized subsidiaries, divisions or affiliates, less Authorized Deductions." FAC, Ex. A, §1(m).

56. Section 1(d) of the Agreement provides that "'Billing Price' means the actual wholesale list price (prior to any reductions offered to a particular customer) of an item multiplied by the number of units ordered by the customer." FAC, Ex. A, §1(d).

57. Section 1(p) of the Agreement provides that "'Royalty Bearing Product(s)' means the items and products as described on Exhibit B hereto, made according to Licensor's specifications, and any other products which become and/or are later added as Royalty Bearing Products by mutual agreement of the parties, which are sold, prepackaged and identified by the Licensed Names and Marks." FAC, Ex. A, §1(p).

58. On May 31, 2022, Mrs. Fields provided written notice to TON of termination for cause pursuant to Section 15.2 of the Agreement. FAC, ¶66; FAC, Ex. R; Ex. 28 (TON Deposition Exhibit 27). Mrs. Fields stated in its May 31, 2022 letter that the bases for the cause were TON's unremedied breaches of the audit requirement and the 20 percent limitation on sales to discount stores. FAC, Ex. R; Ex. 28 (TON Deposition Exhibit 27); Tejada Dep., 178:9-14, 179:10-181:20 (Ex. F). The May 31, 2022 letter also stated that the quarterly royalty report submitted by TON on May 4, 2022, revealed that TON sold over 23% of its sales to the value channel in the first quarter of 2022. FAC, Ex. R.

59. TON responded in a letter dated June 21, 2022. FAC, Ex. S. TON took the position

that discount store sales were below the 20 percent limitation based solely on sales to Dollar Tree. FAC, ¶¶60, 67. TON ignored, however, its sales to the many other discount stores that are properly included in the 20 percent limitation calculation under the Agreement. *See* Exhibit 6.

60. In the first quarter of 2022, TON also began selling to Ollie's. Ex. 6. Tejada reviewed Ollie's website and public information, which confirmed that Ollie's is a value or deep discount store. Tejada Decl., ¶¶5, 6; Exs. 10, 11.

61. TON acknowledged in its letter dated June 21, 2022, that it had not provided all documents requested by the auditor. FAC, Ex. S.

62. Since the May 31, 2022 notice of termination, TON has continued, for each quarter, to sell more than 20 percent of Net Sales to value or deep discount stores. Ex. 21 (TON Deposition Exhibit 46); Ex. 22 (TON Deposition Exhibit 47); Exs. 32, 33 (TON Deposition Exhibits 44, 45) ; Tejada Dep., 207:21-208:14, 208:16-21, 208:24-209:23, 210:4-211:1 (Ex. F).

63. TON filed a complaint against Mrs. Fields in the United States District Court for the Northern District of Illinois on June 22, 2022. (Dkt. 1).

64. By letter on August 18, 2022, Mrs. Fields informed TON its Q2 2022 royalty report reflected total Net Sales exceeding 20% to value/deep discount/dollar stores for the quarter, reflecting additional evidence of material breaches. FAC, Ex. T; Ex. 21 (TON Deposition Exhibit 46).

65. By letter on November 4, 2022, Mrs. Fields informed TON its Q3 2022 royalty report reflected total net sales exceeding 20% to value/deep discount/dollar stores for the quarter, violating §1(h)(x) of the Agreement. FAC, Ex. W; Ex. 22 (TON Deposition Exhibit 47).

66. In its November 4, 2022 letter, Mrs. Fields also informed TON that it provided at least three written notices of its breaches of the Agreement, thus giving Mrs. Fields an independent ground for immediate termination of the Agreement pursuant to §15.2(f). FAC, Ex. W; Ex. 22. By

17

November 4, 2022, Mrs. Fields had sent written notice of breach of Section 1(h)(x), the 20% Sales Limitation, on April 1, 2022, May 31, 2022, and August 18, 2022. The November 4, 2022 letter was a fourth written notice of breach of Section 1(h)(x). FAC, Ex. W; Ex. 22. Mrs. Fields stated on November 4, 2022 that independent of the May 31, 2022 for-cause termination, the Agreement was terminated immediately. FAC, Ex. W; Ex. 22.

May 9, 2025                                         Respectfully submitted,


                                                    /s/ Nancy A. Temple
                                                    Nancy A. Temple

                                                    One of Defendant's Attorneys


Nancy A. Temple
Jeffrey R. Tone
Anthony Nguyen
Katten & Temple, LLP
209 S. LaSalle St., Suite 950
Chicago, IL 60604
(312) 663-0800
ntemple@kattentemple.com
jtone@kattentemple.com
anguyen@kattentemple.com

## CERTIFICATE OF SERVICE

      The undersigned, an attorney, certifies that on May 9, 2025, I electronically filed the foregoing **Defendant's Local Rule 56.1 Statement of Undisputed Facts** with the Clerk of the Court using the CM/ECF system which sent notification of filing to all counsel of record.

/s/ Nancy A. Temple

Nancy A. Temple
Katten & Temple, LLP
209 S. LaSalle Street, Suite 950
Chicago, IL 60604
(312) 663-0800
ntemple@kattentemple.com